## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| ISAAC WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:06-cv-04760-JEO |
| | ) |
| PHILLIP GUTHERY, Individual Capacity; | ) |
| BRYAN CHAPMAN, Individual Capacity; | ) |
| DAVID ELLIS, Individual Capacity; | ) |
| ROBERT ZUBER and EMILE | ) |
| AMBROISE,[1] both in Individual Capacities; | ) |
| PRISON HEALTH SERVICES, INC. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This cause is before the court following a trial on the merits concerning the excessive force allegations against defendants Phillip Guthery, Bryan Chapman, David Ellis, Robert Zuber and Emile Ambroise contained in Count I and the medical claim against defendant Zuber contained in Count II.  Upon consideration, the court finds that judgment is due to be entered in favor of the defendants on both claims.

## I.    BACKGROUND

As has been noted previously, the plaintiff initially filed a *pro se* complaint alleging that the defendants, including Guthery, Chapman, Ellis, Ambroise, Zuber, unnamed correctional officers, and the Alabama Department of Correction (hereinafter "ADOC"), used excessive force resulting in a broken rib.  (Doc. 1).  Following preliminary proceedings, the plaintiff was

---

[1]The docket sheet lists this defendant as Ambrose, while the parties refer to him as Ambroise.

permitted to proceed on his claims against the individual defendants in their personal capacities. (Doc. 42).  Thereafter, the plaintiff consented to the jurisdiction of the undersigned.  (Doc. 44). He was appointed counsel.  (Doc. 45).

Appointed counsel filed an amended complaint.  (Doc. 56).  Count I reiterated the initial claim of excessive force, pursuant to 42 U.S.C. § 1983; Count II alleged a claim of deliberate indifference to his medical needs, pursuant to § 1983; and Count III alleged a state law breach of contract claim against Correctional Medical Services ("CMS").  (*Id.*)  The plaintiff later filed a third amended complaint substituting Prison Health Services, Inc. ("PHS"), for CMS.[2]  (Doc. 65).  PHS filed a motion for summary judgment on the third-party beneficiary claim for breach of contract (Count III).  (Doc. 88).  The ADOC defendants also filed a motion for summary judgment.  (Doc. 100).  The court found that the motions for summary judgment of PHS on the contract claim and the ADOC defendants on the denial of medical care claim (doc. 88 & 100) were due to be granted except as to the medical claim advanced against Zuber.  (Doc. 117 &118). Accordingly, the excessive force allegations contained in Count I against all the ADOC defendants in their individual capacities and the medical claim in Count II against Zuber in his individual capacity remained for trial.

## II.    THE TESTIMONY

### A.    The Plaintiff

The plaintiff is incarcerated at the St. Clair Correctional Facility in the segregation unit. He is serving a sentence for burglary.  During the day on August 9, 2006, he went for a medical appointment outside the facility for a follow-up examination for an injured jaw.  Transportation

---

[2]PHS has also consented to the jurisdiction of the undersigned to dispose of this matter.  (Doc. 92).

2

correctional officers returned him to the unit around 3:15 p.m.  They removed his "belly-chains" and "leg irons" and he preceded to his cell in his handcuffs.  At that time, officers in the unit, including Bryan Chapman and Phillip Guthery, were supervising inmates getting their hair cut. Guthery saw the plaintiff as he was returning to the cell area.  Guthery told the plaintiff that he needed a haircut.  The plaintiff, believing that his hair was within prison regulations, objected and continued walking to his cell.  Guthery then grabbed the plaintiff by the handcuffs. According to the plaintiff, Guthery old him that he was "going to get a haircut whether [he] need[ed] one or not."  The plaintiff responded that he wanted to see the shift commander. Guthery ignored his request.  Guthery and Chapman "snatched" the plaintiff to a hallway that was attached to the cell block and "slammed" the plaintiff to the ground, hitting his face. Guthery and Chapman began "punching and kicking" the plaintiff.  Guthery then told Chapman to get the "leg irons."  Once the "leg irons" were secured, the plaintiff was taken to the infirmary by officers, including Carlos Wood.

When he arrived at the infirmary, Nurse Faye Henry examined him and prepared a "body chart" to document any bruises or other injuries.  (Pl. Ex. 2).  At the time, he was under the control of Officers Emile Ambroise,[3] David Ellis and Robert Zuber.  Ellis was right next to him, Ambroise was in front of him and Zuber was alongside Ellis.  The plaintiff stated that at the time, his face (eye) was swollen, his side hurt, and it was hard for him to breathe.  About that time, Guthery walked into the infirmary with Sergeant Graves.  According to the plaintiff, Guthery approached him "in an aggressive matter with his fists.  And he was cursing at [the plaintiff], talking about what he was going to do to [him]."  He stated that he was going "to beat [the

---

[3]Ambroise's name is also incorrectly referenced as Ambrose in various places in the record.

3

plaintiff's] ass.  And he was walking [toward the plaintiff] with his fists balled up."  The plaintiff

stood up.  Ellis grabbed him around the neck and the officers "jumped" the plaintiff again.

Specifically, the plaintiff stated that Ambroise grabbed the plaintiff's "leg irons" and "snatched"

his feet from under him.  They then began "punching and kicking" him while he was handcuffed

and in "leg irons."  He ultimately was taken to a segregation unit in the infirmary where he

remained until he was taken to Captain Carter's office around 6:30 p.m.[4]  He was taken there by

wheelchair because he was "short-winded" and hurting "real bad."  While in Carter's office, he

was informed of the disciplinary violations he with which was charged.[5]  Thereafter, he was

taken by wheelchair to his cell in the segregation unit by wheelchair.  He remained there, as best

the plaintiff can recall, until he was removed and taken to the hospital at the University of

Alabama in Birmingham (hereinafter "UAB Hospital").

　　　　Shortly after he was placed in his cell during the evening of August 9, 2006, the plaintiff

completed a "sick call" slip and placed it in his cell door.  (Pl. Ex. 4).[6]  It is marked as being

received by the nurse at 3:15 a.m. on August 10, 2006.  In it, the plaintiff describes his "problem

or request" as follows: "My rib hurt [sic] every time that I take a breathe [sic].  I don't know if

they are broken or what."  (*Id.*)  According to the form, the plaintiff was seen around 7:15 p.m.

on August 10.  The nurse, Henry, classified the matter as "routine."  (*Id.*)  She further noted that

the plaintiff was complaining about pain in the right rib area.  She also stated that he had three

contusions in the right rib area, a lump below the left knee, and nasal edema.  (*Id.*)  The plaintiff

---

[4]The plaintiff's third body chart for the day states that his exit time was 18:28 (6:28 p.m.).  (Pl. Ex.  3).

[5]The disciplinary violation included disobeying a direct order, assault on an officer, and threatening an officer.

[6]References herein to "Pl. Ex. ___" are to the plaintiff's exhibits that were admitted at trial.

4

stated that he had no recollection of being treated by a nurse.

The plaintiff also filled out a grievance form and placed it in his cell door.  (Pl. Ex. 5).
By the third shift, which began around 10:00 p.m., the plaintiff heard other inmates "kicking and
beating" on a door to get him some nursing help.  The next thing that he remembered was waking
up at UAB Hospital.[7]

During cross-examination, the plaintiff acknowledged, *inter alia*, that he refused the order
to get a haircut; that he did not complain in his disciplinary filings about being "punched,"
"slammed," or kicked; that the nurse in the infirmary described him as being belligerent; that he
(the plaintiff) stated Officer Wood pulled Chapman and Guthery off of him; that he was mad and
did "lose control" at one point after the incident with Guthery and Chapman in the hallway; that
he threatened the officers in the infirmary after they jumped him; that he remembered the pill call
on August 9, but the nurse did not stop[8]; that he did not deny being treated by a nurse on August
10; and that he did not hear Zuber say anything about denying him medical attention.  The
plaintiff also stated that he was not making excessive force claims against Chapman or Guthery
concerning the events in the infirmary.

### B.    Kendarrius Daniels

Daniels was an inmate who was confined in the segregation unit with the plaintiff.  His
cell was across from the plaintiff.  He recalled the plaintiff returning from his outside medical
visit.  He further recalled that the plaintiff refused a haircut because he did not need one.  He also
recalled Guthery and the plaintiff arguing about the same and the plaintiff walking away towards

---

[7]The PHS medical records show that the plaintiff was referred to UAB via a physician's order on August 11, 2006.
(Pl. Ex. 14F & G).

[8]The plaintiff also disputed the nursing notes (Pl. Ex. 4B), which stated that he was acting in a threatening manner.

his cell.  According to Daniels, the officer then grabbed the plaintiff and pulled him toward him.

The plaintiff fell and was taken out of the cell area.  He than heard the plaintiff saying, "Please

don't hurt me.  I ain't did [sic] nothing."  He described the plaintiff as making a plea for his life.

Daniels also stated that he heard a "clacking" noise being made by sticks.   The next thing he saw

was the plaintiff being returned to his cell in a wheelchair.  He appeared "beat up, bruised up."

Daniels and the other inmates were hollering to the guards to get the plaintiff some help in the

infirmary.  He heard the plaintiff groaning in his cell, complaining that his chest hurt.  When an

unidentified officer came into the cell block, he did not respond to the inmates' requests for

assistance for the plaintiff.  Daniels also stated that officers would not let the nurses approach the

plaintiff's cell during pill call.  Finally, according to Daniels, the officers responded to the noise

and went into the plaintiff's cell and he was taken to the hospital in a wheel chair.

During cross-examination, Daniels admitted that he was serving a sentence for robbery.

He also stated that when the plaintiff initially returned during the haircut time, Ellis, Ambroise

and Wood were with Chapman and Guthery.  He also acknowledged that it was not right for an

inmate to refuse an order to get a haircut and walk away.  He stated that it was Chapman who

initially pulled the plaintiff from behind in the unit.  He also stated that he heard the officers

striking the plaintiff with sticks, batons or "billy clubs" made of iron.  He further stated that when

one of the nurses went toward the plaintiff's cell door after the incident, an unidentified officer

told her, "Naw.  Don't go to his door.  Don't worry about it."  According to Daniel, the plaintiff

never left the cell after the incident until he was taken to the hospital.  His food trays were slid

under his door.[9]

### C.   Antonio Smith

Smith was also housed on the segregation unit with the plaintiff.  He stated that officers

> hit him a couple of times – with their sticks.  In one incident, they took him out
> the cell and brought him back.   That was like later on.  But they still didn't do
> nothing [sic] for him at HCU when he did went [sic] out of the cell for
> medication, I believe.
>
>          ....
>
>          When he come [sic] back – he was walking when he left.  When he come
> back, he was in a wheelchair.  So I'm pretty sure they did something to him.
> Instead of putting him in the bed, he wind [sic] up on the floor.

According to Smith, one unidentified officer would not let the nurse give the plaintiff

medication.  He also recalled that when the plaintiff was finally removed from his cell, he could

see food trays on the floor.

On cross-examination, Smith admitted that he was convicted of various offenses

including rape and sodomy.  He also stated that one of the officers who took the plaintiff out of

the unit had some type of stick and was hitting the plaintiff with it.

### D.   Defendant Guthery

Guthery testified that he told the plaintiff that he needed a hair cut.  The plaintiff

disagreed and walked away.  Guthery removed him to the hallway.  The plaintiff wanted to see

the shift commander and started to walk away from Guthery.  He responded by grabbing the

plaintiff's handcuffs to stop him from leaving the area.  About this time, Officers Tish, Callahan

and Wood arrived.  Guthery got the plaintiff to the floor using the handcuffs for leverage.  He

---

[9]Due to the way the cells were constructed, Daniels was able to see under the plaintiff's cell door so as to discern movement.

was assisted in his effort by Chapman.  The plaintiff resisted, trying to "break away."  When the plaintiff was on the floor, Guthery told Chapman, who was holding the plaintiff around the neck area, to get the "leg irons."  He did so and the plaintiff was secured and removed from the area. He was taken to the infirmary by Sergeant Graves and other officers.  Guthery stated that no one hit or kicked the plaintiff.  He did not know how the plaintiff broke his rib.

Because of the altercation with the plaintiff, Guthery was escorted by Sergeant Graves to the infirmary for examination and preparation of a "body chart" to document any injuries. Despite his suggestion to wait until the plaintiff was through in the infirmary, Graves ordered Guthery to go with him to the infirmary because he was bleeding from a small scratch.  Once they arrived  inside the infirmary and the plaintiff saw them, he rose out of his chair and toward Guthery.  The other officers, Ambroise, Ellis and Zuber reacted by taking the plaintiff to the floor.  Guthery heard the plaintiff cussing him "like a yard dog."  He did not see anyone kick or hit the plaintiff.  Guthery did not see anyone strike the plaintiff with a stick (baton) or with their feet.  After a body chart was completed, documenting his injuries, Guthery returned to the segregation unit to continue helping with the haircut detail.  Guthery did not recall having any interaction with the plaintiff on the 10th or the 11th.

Guthery also discussed the procedure concerning the handling of communications with inmates such as sick call requests, grievances and mail.  Concerning the sick call requests, he stated that they usually were picked up by the nurses on the third shift (10:00p.m. to 6:00 a.m.). The infirmary issues the orders concerning the care and treatment to be given, including the bringing of an inmate to the infirmary.  Guthery also discussed the procedures concerning "checking" on inmates during an average day, including the daily counts five times a day.

8

Guthery stated on cross-examination that he did not have or use a baton while working in the segregation. He further stated that he did not see anyone with such an instrument. Lastly, he stated that during the altercation in the hallway in the segregation unit, the plaintiff was aggressively resisting the officers even after the "leg irons" were in place.

### E.   Carlos Wood

Officer Wood was working on the top tier of the segregation unit when he heard a commotion. He ran down to the hallway. When he arrived, the plaintiff was still resisting and cussing. Guthery and Chapman both were telling the plaintiff to calm down. They finally got things under control. Wood did not notice anything on the plaintiff that required immediate medical attention. He (Wood) and Officer Thomas Burt took the plaintiff to the infirmary. The plaintiff was cooperative with them. Graves and Guthery arrived a little later. When they did, the plaintiff jumped out of his chair toward them in an "aggressive manner." The officers, Ellis, Ambroise and Zuber, restored control and the plaintiff was moved to an isolation unit in the infirmary.

### F.   Bryan Chapman

Chapman testified that Guthery initially grabbed the plaintiff in the segregation unit when he walked away from Guthery after refusing a haircut. During the altercation in the hallway, Chapman placed his knee on the plaintiff 's shoulder to hold him down. At some point, he put on the leg irons. Even after this, he stated that the plaintiff was still twisting and attempting to break away. Chapman stated that all the involved officers were all telling the plaintiff to calm down. Finally, Sergeant Graves arrived and Officers Wood and Burt took the plaintiff to the

infirmary.[10]  Chapman denied hitting, punching, or kicking the plaintiff, but acknowledged using a mandibular angle pressure point move[11] on the plaintiff in an attempt to control him.  He noted that the plaintiff was hollering and cursing at the officers, but he did not complain about being hurt.

He also stated that the plaintiff did not request medical assistance from him.  He further described the procedures used to inform the nurses of the sick call needs, stating that if the nurse misses a slip, the officers can pass it on to them.  He noted that it was Zuber that accompanied the nurse on the 6:55 p.m. pill call.  Chapman also reviewed one of the logs for August 9, and stated that it appeared that Officer Zuber was with nurse Lowe for the pill call that occurred on the segregation unit at about 6:55 p.m.  He also stated that sick call slips such as this one were usually picked up during the third shift (10:00 p.m. to 6:00 a.m.).

### G.    Mary Smith

Ms. Smith was the Health Services Administrator at the facility during August 2006.  Via deposition, she testified that if there is a security concern regarding an inmate and the officers say not to go in the cell, the health care personnel do not.

### H.    Robert Zuber

Zuber testified that he was a rover in the infirmary when the plaintiff was brought over for an examination.  He heard the commotion, but by the time he got to where the disturbance

---

[10]In their incident report statements, Officers Burt, Wood and Ambroise state that Zuber helped restrain the plaintiff. (Pl. Ex. 22 & 23).  Zuber states that this is incorrect.  According to Zuber, he did not "lay a hand on [the plaintiff]."

[11]This move was described in the testimony as a tool to used to gain control of an inmate.  It is learn by the officers during their training.

occurred, the plaintiff was restrained.[12]  He assisted other officers in placing the plaintiff in the

infirmary isolation cell after the incident.  Zuber noted that the plaintiff was still resisting the

officers when he arrived.  He also stated that the plaintiff did not complain about his physical

condition while he was with him.

Zuber also described making rounds with the medical staff for pill call.  He stated that the

decision to stop and see an inmate is basically at the nurses discretion.  If the nurse indicates that

a particular inmate is due to get medication, the officer opens the tray door located on the cell

door and the medication is provided.  He admitted that it would be improper for a corrections

officer to interfere with the giving of medication or medical assistance to an inmate.  He further

stated that he never interfered with an inmate receiving medical care.  Concerning the pill call on

the day of the incident, Zuber had no specific recall of the same.  He also had no recall of the

plaintiff making a request for medical assistance on the night of August 9.  He did say that if the

plaintiff made such a request, "his request would have been granted."  Later, during questioning,

he stated that if the plaintiff stated that he discussed his medical difficulty with Nurse Lowe and

Zuber, he would dispute that because, if he had had such a conversation, Zuber would have taken

the proper steps to act on it.

Zuber also testified concerning the numerous times during a shift that an inmate would be

seen or checked while in the segregation unit.  He specifically stated that it would usually be

once or twice an hour, including inmate counts.

---

[12]This is inconsistent with the prior affidavits or statements of Wood (Pl. Ex. 16 & 23(duplicate)), Ambroise (Pl. Ex. 19), and Burt (Pl. Ex. 22),  but consistent with the statement of Ellis (Pl. Ex. 18).  It should also be noted, however, that Ambroise did not mention Zuber in his August 9, 2006 statement (Pl. Ex. 20).

## I.      Dr. George Lyrene

The defendants' first witness was Dr. George Lyrene.  He is a consultant who functions as a medical director for the Department of Corrections.  He briefly testified to the fact that the plaintiff's situation was correctly handled from a medical perspective.

## J.      Richard Carter

Mr. Richard Carter was formerly employed by the Department of Corrections as a captain.  He was the captain over the segregation unit at the time of the incident.  He had not personally viewed any of the incidents at issue in this matter.  He testified generally about some practices and procedures in the segregation unit at the relevant time.  He also stated that the officers on the segregation unit were required to carry batons.[13]  Finally, he discussed the interview he conducted with the plaintiff after the incidents.  In his report concerning the interview, he stated, in pertinent part:

> ....  Inmate Williams stated he was frustrated when he had returned from a medical run and referred to the high temperatures Alabama [sic] weather had been during the day and just snapped when the Officers approached him about his haircut. Inmate Williams went on to speak about an incident where one of his brothers was killed by another brother in the recent past of which I was aware of.  Inmate Williams went on to say he was worried about his mother and family due to no communication by phone or letters.  Upon further investigation, it was determined his mother had a new phone number of which inmate Williams had not been notified.  Inmate Williams was instructed to update his phone list and refer to Mental Health for further evaluation.

(Pl. Ex. 21).

## K.      Emile Ambroise

Ambroise testified that he was working in the infirmary on the day in question.  He

---

[13]However, after stating that they were required to carry batons, he stated that they were "highly recommended." Ultimately, he stated that the officers need one.

recalled that the plaintiff came into the infirmary.  He described the plaintiff as being agitated

and upset.  When Guthery entered the infirmary, the plaintiff became more upset and got out of

his chair and moved toward Guthery in an aggressive manner.  He and the other officers who

were present, including Ellis and Zuber, tried to de-escalate the situation.  As a result of the

tension, the plaintiff had to be taken to the floor.  At the time, he was continuing to make threats

toward Guthery, including threats to kill him.  Ambroise also recalled that at one point, the

plaintiff got made with Ellis and turned toward him in an aggressive manner.  This again required

that the plaintiff be forced to the floor.  He denied ever grabbing the plaintiff's leg irons and

pulling him to the floor.  He further described the plaintiff's attitude as "agitated, belligerent and

violent."

     During his testimony, Ambroise noted that he had been inconsistent in his prior

statements concerning who was involved in the altercation in the infirmary.

     **L.**    **David Ellis**

     Ellis testified that he was working as the rover in the dialysis unit of the infirmary on the

date of the incident involving the plaintiff.  He heard a commotion at the front of the unit.  He

walked there to see what was occurring.  He saw the plaintiff entering the unit with Burt and

Wood.  The plaintiff was cussing, screaming and threatening the various officers.  The nurse was

attempting to chart his injuries, but the plaintiff was still belligerent, loud, and cursing.  When

Graves and Guthery entered the unit, the plaintiff responded by charging toward Guthery.  He

was also cussing him.  The plaintiff was controlled by the officers.  Graves told Ellis and

Ambroise to take the plaintiff to the single cell part of the infirmary.  The plaintiff responded to

Ellis' attempt to get him up and move him by charging at Ellis.  The officers again gained control

of the plaintiff and moved him to the isolation unit.  He remained non-compliant while he was being moved.

### M.      Thomas Burt

Burt was working in the segregation unit when he was called upon after the first incident to take the plaintiff to the infirmary with Officer Wood.  He did not see the initial altercation in the hallway.  When the plaintiff was in the infirmary, Graves and Guthery entered and the plaintiff stood up in an aggressive manner towards Guthery.  He was restrained by the officers and forced back into the chair for further evaluation.  Burt believes that Graves told Ellis and Ambroise to place the plaintiff in the isolation cell.  When Ellis grabbed the plaintiff by the shoulder, he reacted by "wrestling" with Ellis.  Ellis and Ambroise placed the plaintiff on the floor.  He was then moved to the isolation unit.

Burt stated that the plaintiff did not complain to him about being mistreated.  He also stated that, although the plaintiff was in "leg irons," he could still move "fast."

### N.      Other Evidence

#### 1.      Medical Evidence

The plaintiff's second body chart for August 9, 2006, after the segregation unit altercation and before the infirmary altercation, shows that the plaintiff had abrasions on his back left side only.  (Pl. Ex. 2).  According to his chart, the plaintiff's intake time was 3:36 p.m. and his discharge time was 3:50 p.m..  Nurse Henry also noted that the plaintiff was belligerent and had a few small abrasions.  (*Id*.)

The plaintiff's body chart after the infirmary altercation indicated abrasions on the left elbow, mid-back, right side and back, left elbow, right hand, below the chin, on the neck, and at

14

the ankles.  (Pl. Ex. 3).  His abrasions were cleaned and treated.  The plaintiff also complained of knee pain.  (*Id*.)  By agreement of the parties, it appears this chart was made around 5:19 p.m., and the plaintiff was discharged at 6:28 p.m.[14]

The plaintiff's "Sick Call Request" dated August 9, 2006, indicates that it was received at 3:15 a.m. on August 10, 2006, by Nurse Henry.  He was seen, according to the request, at 7:15 p.m. on August 10, 2006.  It indicates that the plaintiff complained about pain in his right rib area.  She also indicated in the notes that he had contusions in the right rib area, a lump below his left knee and swelling around the nose.  (Pl. Ex. 4).  The examination was deemed "routine" and he was referred for later examination by a medical doctor or physician's assistant.  (*Id*.)  This is further supported by the progress notes and the "Nurse Evaluation Tool" for August 10, 2006. (Pl. Ex. 14 D & E).

The plaintiff's August 9, 2006 "Inmate Grievance" form complains that he was denied medication on August 9, by nurse Lowe during rounds.  (Pl. Ex. 5).[15]  The response from the medical unit nurse on the next day states that she had been informed about threats to staff and that the nurses were told to stay away due to the risks involved.  She further states that she regretted that he was in pain, but "safety is first."  (*Id*.)

There is also an "Infirmary Nursing Progress Note" for an unspecified time on August 9, 2006, that states during pill call, the plaintiff was cussing and threatening the nurse if she came in front of the cell.  (Pl. Ex. 4B).  Accordingly, he did not receive any medication (pills).  (*Id*.)

The "Prehospital Patient Care Report" prepared by the transporting medical personnel

---

[14]The agreement is noted because the document actually notes a time of 15:19 (5:19 p.m.).  (Pl. Ex. 3)

[15]This exhibit is difficult to read.  The best viewing is Document 90 at 67 of 116.

states that the plaintiff "was found unresponsive" in his cell at about noon on the day he was transported (August 11, 2006).  (Pl. Ex. 39).[16]  It also states that the plaintiff informed the medical personnel that his rib pain was "10 on 10" pain scale.  (*Id*.)  It further states that the pain was described as "sharp and constant."  (*Id*.)

The "UAB Hospital Discharge Summary" states that the plaintiff was diagnosed with a "remote left 12th rib fracture."  (Pl. Ex. 40).[17]  It further states that the plaintiff was admitted overnight without complications.  He was discharged with a direction for a follow-up appointment in two weeks.  (*Id*.)  The August 11, 2006 Notes state that at the time the plaintiff was received (4:15 p.m.), no acute stress was noted.  (*Id*.)

### 2.    The Various Log Sheets

Various log sheets were admitted into evidence at trial, including the "Duty Post Log" for the infirmary.  It shows that Zuber entered on duty at the infirmary at 1:58 p.m. on August 9; Wood and Burt brought Williams to the infirmary at 3:35 p.m. for a body chart; at 3:52 the plaintiff left his chair, attacked Ellis, and had to be "restrained and put down;" at 4:17 p.m. Carter, Wood, Jones and Handley escorted the plaintiff to the isolation unit;[18] at 5:19 p.m. the plaintiff was returned to the infirmary; at 6:28 p.m. the plaintiff exited the infirmary; and at 6:53 Zuber left for the segregation unit with Nurse Lowe for pill and sick call and returned about 8:41. (Pl. Ex. 25).

---

[16]This is corroborated by the UAB Hospital records.  (Pl. Ex. 40).

[17]The radiology report states, "There is irregularity of the left posterior 12th rib consistent with fracture but its age is uncertain and it may be remote; no other rib fractures are identified."  (*Id*.).

[18]The entry also described the plaintiff as belligerent, agitated, and making threats to kill and stab Ambroise.  (Pl. Ex. 25).

The segregation unit "Duty Post Assignment" log for the plaintiff's area shows that he

left the institution at 10:10 a.m. for his outside medical visit; he returned at 3:30 p.m.; Zuber

escorted Nurse Lowe on pill call in the unit at 7:56 p.m.; the plaintiff was escorted to his cell at

8:02 p.m.;[19] and at 10:20 p.m. the log reads, "Cell C-8 (Isaac Williams) complaining that his ribs

are hurting and it is hard to breathe. Infirmary notified. No action taken by infirmary staff." (Pl.

Ex. 26).

The Segregation Clerk's "Duty Post Assignment" log for August 9, 2006, shows that

Guthery relieved another officer of log duties at 1:45 p.m. (Doc. 27). The "Duty Post Log"

shows that Burt and Wood left the unit with Williams at 3:35 p.m., headed for the medical unit.

(*Id*. at 3 of 6). It also shows at 4:14 p.m. that "Inmate Williams refusing medical treatment and

being disorderly, ordered by Capt. Carter to place Williams on the walk yard." (*Id*.) It further

shows the plaintiff leaving the unit at 5:14 p.m. with Guthery and Handley and returning with

them at 6:29 p.m. (*Id*. at 4 of 6). Next, it states Zuber entered with Lowe for the pill and sick

call at 6:55 p.m. and left at 8:34 p.m. (*Id*. at 4 & 5 of 6). Finally, it shows a pill call at 2:38 a.m.,

which was completed at 3:48 a.m. by Officer Mitchell and Nurse Jacoby. (*Id*. at 6 of 6).[20]

### 3.    Other Department of Corrections Documentation

The admitted evidence also includes the "Segregation Unit Record Sheet" for the plaintiff

for the week of August 7 through August 13, 200. (Pl. Ex. 24). It shows that on August 9 and

10, the plaintiff received his meals. It also shows that he received a shower on August 10. On

---

[19]Circumstantial evidence suggests that the delay was due to the plaintiff meeting with Carter.

[20]The court notes that the exhibits include additional information, but much of it is not contested. For instance, the "Second Shift Segregation" log (Pl. Ex. 28) shows who worked on August 9, 2006, and what unit and position they were assigned. Further, there were a number of Department of Corrections policies and procedures that were admitted. (See e.g., PL. Ex. 32 (personal hygiene, pill call, sick call, and additional procedures)

August 11, it shows that he received breakfast and lunch.  Additionally, in the "Exercise" column, it indicated he had exercise from 6:20 until 7:20 on August 11.  It further shows a medical visit on August 10 and him going to the infirmary and the hospital on August 11.

Photographs of the segregation unit and other areas are included in the plaintiff's exhibits. (Pl. Ex. 48-50).

### O.   Other Matters

During the course of the trial, it also became evident that the Alabama Department of Corrections did not maintain the relevant duty/shift logs for the institution for August 11 & 12. Counsel for the Department acknowledged that they were destroyed after two years as was customary at the institution due to the volume of such records.

## III.   DISCUSSION

### A.   Excessive Force

#### 1.   The Law

The plaintiff asserts that defendants Guthery, Chapman, Ellis, Zuber, and Ambroise, used excessive force in their treatment of him during the altercations in the segregation unit and in the infirmary.

Maintaining institutional security and preserving internal order and discipline are essential goals of a prison administration and may require limitation or retraction of the constitutional rights of prisoners.  *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 47 (1979).  Prison officials must, therefore, be free to take appropriate action to insure the safety of inmates and staff and the courts will not normally second-guess those officials on matters involving internal security.  *Wilson v. Blankenship*, 163 F.3d 1284 (11th Cir. 1998).  When action

18

is taken by a prison official to prevent a security threat or to restore official control, the court's

Eighth Amendment inquiry focuses on whether force was applied in a good faith effort to

maintain or restore control or was undertaken maliciously or sadistically to cause harm. *See*

*Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010); *Sims v. Mashburn*, 25 F.3d 980 (11th

Cir. 1994).[21]   In addition to the extent of injury suffered by an inmate, the factors to be examined

in determining whether the use of force was wanton and unnecessary include an evaluation of:

(1) the need for the application of the force, (2) the relationship between that need and the

amount of force used, (3) the threat reasonably perceived by the responsible officials, and (4) any

efforts made to temper the severity of the response. *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.

Ct. 995, 117 L. Ed. 2d 156 (1992).

      2.     **Analaysis**

        a.     **The Segregation Unit Occurrence**

      The plaintiff's first claim of excessive force concerns the incident that occurred in the

segregation unit.  It involves defendants Guthery and Chapman.

      Concerning the first factor, the need for the application of force, the court finds that the

evidence demonstrates that the plaintiff refused to comply with Guthery's command that he get a

haircut.  It is also clear to the undersigned that the plaintiff walked away from Guthery and he

responded by grabbing the plaintiff's handcuffs.  He then moved him to the hallway where the

altercation occurred.  As Guthery responded, the plaintiff did likewise, causing an escalation of

the situation.  This resulted in Guthery and Chapman exerting additional force to bring the

---

[21] The Eleventh Circuit has explained that this "heightened specific-intent requirement" is not met merely by showing that, in retrospect, the degree of force applied "was unreasonable and hence unnecessary in the strict sense." *Campbell v. Sykes*, 169 F.3d 1353, 1374 (11th Cir. 1999); *quoting Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986).

plaintiff to the ground.  Under the circumstances, the court finds that there was a need for the

application of force.  As stated above, the courts have long held that prison officials must be free

to take appropriate measures to ensure the safety of inmates and staff. *Wilson*, *supra*.

The relevant question is whether any of the named defendants acted in violation of the

Eighth Amendment in handling the plaintiff in the hallway.[22]  When immediate action is

warranted, the Eighth Amendment is not violated where, as here, force is applied in a good faith

effort to restore order. *Ort v. White*, 813 F.2d 318, 323 (11th Cir. 1987).

The second factor to consider in determining if any defendant's use of force violates the

Constitution is the relationship between the need for force and the amount of force used.  The

court has just discussed that the use of force was necessary.  The next inquiry is whether the

plaintiff's evidence convinces the court that the amount of force was excessive or unnecessary.

If the plaintiff is believed, the striking, kicking, and beating inflicted in the hallway would be

unreasonable.  If the defendants are believed, the amount of force was reasonable.

After considering the totality of the evidence, the court is not convinced that the force

exerted by the defendants was unreasonable under the circumstances.  There is no question that

the plaintiff sustained a broken rib at some juncture.  However, the court is not convinced that

the injury is a consequence of the use of an unreasonable amount of force.

The third factor concerns whether the threat posed by the plaintiff was reasonably

perceived by the responsible officials.  It is clear to the undersigned that the plaintiff was unruly

---

[22]It is also apparent that anytime a prisoner causes a disturbance, it has the potential of inciting a wider disturbance involving other inmates.  Therefore, in *Whitley*, the Supreme Court recognized that "[w]hen the ever-present potential for violent confrontation and conflagration ripens into *actual* unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,' carries special weight."  475 U.S. at 321 (internal quotations and citations omitted).

given the circumstances. Additionally, it is clear the situation escalated quickly. The plaintiff acknowledged in his interview with Carter that he was frustrated on the day in question and he "snapped." (Pl. Ex. 21). The court finds that the defendants reasonably perceived a threatening situation under the circumstances.

The fourth factor concerns the efforts, if any, made to temper the severity of the response. Again, the court finds that the plaintiff has not convinced the court that the response was excessive under the circumstances. Although the court has concerns due to the nature of the plaintiff's injuries, particularly the broken rib, it cannot find under the evidence that the response was unreasonable.

The court finds that a judgment is due to be entered on behalf of the defendants on the plaintiff's excessive force claim for the occurrence in the hallway of the segregation unit.

### b.    The Infirmary Occurrence

The second incident concerns the altercation in the infirmary. The defendants involved in this incident include Ellis, Ambroise, and Zuber. The four considerations outlined above apply.

As to the need for the application of the force, the court finds that there was a need for the officers to respond with force in the situation. In reaching this conclusion, the court must and does reject the plaintiff's testimony that Guthery aggressively approached him with closed fists, cursing him, and threatening to "beat [his] ass." This testimony is not otherwise supported by any evidence. To the contrary, it is inconsistent with the remaining testimony. The court further finds that the plaintiff responded to Guthery's arrival at the infirmary in an aggressive and provocative manner and the need to restrain him was precipitated by his abrupt movement out of the examination chair toward Guthery and Graves.

21

The next consideration is the relationship between that need and the amount of force used.  Considering all the testimony, the court finds that the testimony of the plaintiff concerning the events in the infirmary is insufficient to support a verdict on his behalf.  Although the testimony of the defendants and the other witnesses is not without conflict and inconsistencies, in totality, the court finds that the amount of force exerted in the infirmary was reasonable.  The plaintiff's testimony that officers simply began "punching and kicking" him while he was hand cuffed and in "leg irons" does not carry the burden under the evidence presented.

The third consideration is the threat reasonably perceived by the responsible officials.  The court finds that the events in the infirmary were such that the defendants and other officers present, including Graves, had reason to react.  This is particularly true due to the fact that the plaintiff is in a less secure area than when he was in the hallway of the segregation.  The testimony is clear that by this time the plaintiff was agitated, aggravated, and aggressive.  His actions warranted a reasonable response, which was initiated.  The officers quickly contained the threat and placed the plaintiff in a segregation cell.

Lastly, the court must consider the efforts made to temper the severity of the response.  Reviewing the totality of the circumstances, the court finds that the responding officers, including Ellis, Ambroise, and Zuber, reasonably tempered this response to a threatening situation that easily could have escalated into a much more serious event.

The court again finds that a judgment is due to be entered on behalf of the defendants on the plaintiff's excessive force claim for the occurrence in the infirmary.

B.     **Denial of Medical Care**

1.     **The Law**

In *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), "the Supreme Court held that deliberate indifference to serious medical needs is proscribed by the Eighth Amendment's prohibition against cruel and unusual punishment." *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994). To state a claim of inadequate medical treatment, the plaintiff's proof involves an objective and a subjective requirement. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *see also Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989). First, the plaintiff must allege an "objectively serious deprivation" of medical care, which requires (1) "an objectively serious medical need ... that, if left unattended, pos[es] a substantial risk of serious harm," and (2) that the defendant's response "was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnosi[s] or treat[ment], or even [m]edical malpractice actionable under state law." *Id*. (alterations in original) (internal quotations and citations omitted). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citation and quotations omitted).

Second, the plaintiff must show that the defendant's subjective intent to punish by pleading facts that would show that he acted with deliberate indifference. *Taylor*, 221 F.3d at 1258. Thus, the plaintiff must demonstrate (1) the actor's "subjective knowledge of a risk of serious harm;" (2) the actor's "disregard of that risk;" and (3) "conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir.2004) (citation omitted). As

noted in *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990), the proof must demonstrate

> ... that prison officials were deliberately indifferent to his injuries. A prison guard's intentional denial or delay of medical care is evidence of deliberate indifference. *Estelle v. Gamble*, 429 U.S. at 104, 97 S. Ct. at 291. When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference. *Thomas v. Town of Davie*, 847 F.2d 771, 772-73 (11th Cir. 1988); *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *see H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1087 (11th Cir. 1986).

*Brown*, 894 F.2d at 1538.

### 2.   Analysis

This is the more troubling of the plaintiff's claims. As noted throughout this case, there is no dispute that the plaintiff's injuries were objectively serious. He sustained a broken rib. It is evident that the injury was a result of one or both of his altercations. Thus, the plaintiff has satisfied the first prong of his burden of proof.

The next question is whether the plaintiff's proof is sufficient to demonstrate that Zuber possessed the requisite intent to support the subjective component of his claim. The court finds that it is not sufficient. The evidence shows that the plaintiff completed a sick call slip during the evening of August 9, 2006, complaining about rib pain and an inability to breathe; that the nurse conducted a pill and sick call on August 9, and that Zuber accompanied her on the 7:56 p.m. pill call in the plaintiff's unit (Pl. Ex. 26). Accordingly, the relevant issue is whether Zuber was "deliberately indifferent" to the plaintiff's serious medical need.

The evidence shows that Zuber had no specific recall of the second shift pill call (including the 7:56 p.m. time on the plaintiff's unit), he denied ever interfering with the delivery of medical care, and he stated that if the plaintiff had made a request for assistance it would have been granted. The plaintiff states that he remembered the pill call and the nurse did not stop, but

24

he did not hear Zuber say anything about denying him medical care.  Inmates Daniels and Smith

testified that an unidentified officer would not let the nurse give the plaintiff medication.  The

segregation unit log shows that at 10:20 p.m., the plaintiff complained about his ribs and the

infirmary was notified, but no action was taken by the infirmary staff.  (Pl. Ex. 26).  Finally,

unidentified nurse progress notes state that the plaintiff was not given any medication on August

9 because the plaintiff was cussing and threatening the nurse.  (Pl. Ex. 4B).

Under the facts presented at trial, the court cannot find that defendant Zuber was

deliberately indifferent to the plaintiff's medical need for a number of reasons.  At the outset, the

court notes that it is troubled by some of the evidence, including the testimony that inmates are

checked at least once an hour, prison logs showing that he had exercise and received meals at

breakfast and lunch on August 11, and the segregation log stating that the infirmary did not

respond to the notification from the unit of the plaintiff's difficulty.[23]  This evidence, however,

does not implicate Zuber in a constitutional violation of the plaintiff's Eighth Amendment right

to medical care.[24]  The reasons the court finds for Zuber include the following.  First, the plaintiff

could not specifically identify Zuber as denying him relief.  Second, inmate Smith's testimony

was not impressive.  He could not identify Zuber as the offending party, his testimony concerning

the assault on the plaintiff with "sticks" was not credible, and he has at least two felony

convictions that tend to impeach his credibility (see FED. R. EVID. 609(a)).  Additionally, the

---

[23]Another noteworthy entry is the 4:14 p.m. Segregation Unit Duty Post Assignment Log (Pl. Ex. 27) stating that Williams refused medical treatment, was disorderly, and was ordered by Captain Carter to be placed in the walk yard.  This is inexplicable in view of the fact that the testimony and other logs show that from 3:35 p.m. to 6:28 p.m. the plaintiff was in the infirmary.  (Pl. Ex. 25).  Thereafter, he was taken back to his cell in the segregation unit in a wheelchair.

[24]This is particularly true with regard to the 10:20 p.m. call to the infirmary regarding the plaintiff's condition because Zuber had completed his shift at that juncture.  In fact, there is no evidence available concerning who might have received the call in the infirmary and what action, if any, resulted from the call.

court simply was not impressed with him under the circumstances.  Third, Daniels' testimony that an unidentified officer told a nurse not to go near the plaintiff's door is not persuasive enough.  Daniels' testimony regarding the segregation assault is questionable at best.  Fourth, although Zuber was present during the pill and sick call at about 7:56 p.m., such circumstantial evidence is subject to various interpretations, including the one evidenced in the progress notes that the plaintiff was being disruptive and a security risk.

The court finds that a judgment is due to be entered on behalf of defendant Zuber on the plaintiff's denial of medical care claim.

## IV.    CONCLUSION

Premised on the foregoing, the court find that judgment is due to be entered on behalf of the remaining defendants on the excessive force claim in Count I and in favor of Zuber on the denial of medical care claim in Count II.

**DONE**, this the 30th day of December, 2010.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge

26